## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-CR-30073 |
| | ) | |
| PAUL KINCAID, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| STEVEN R. COLLINS, | ) | |
| | ) | |
| Third Party | ) | |
| Respondent. | ) | |

### OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This matter comes before the Court on the United States' Motion for Turnover Order (d/e 98) and United States' Renewed Motion for Turnover Order (d/e 116) (Motion). On April 18, 2008, this Court entered a judgment of conviction against Defendant Paul Kincaid for possession and production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2252A(a)(5)(B). Judgment in a Criminal Case (d/e 58). This Court ordered Kincaid to pay $60,000.00 in restitution and a $200.00 special assessment. Id. at 5. The Government then commenced post judgment supplementary proceedings to collect restitution and special assessment. The

Government commenced a citation proceeding against third party respondent Steven R. Collins.  <u>Citation to Discover Assets Third Party (d/e 74)</u>.  Collins and Kincaid have lived together since 1974 and have been business partners since late 1978 or early 1979.  The Government conducted discovery to ascertain Kincaid's interest in (1) the house and out building in which the two men resided and operated their business, (2) the personal property located on the real estate, and (3) their joint bank accounts. The Government now asks for a turnover order against Collins ordering him to turnover fifty percent of all common property.  For the reasons set forth below, the Motion is ALLOWED in part.

<u>STATEMENT OF FACTS</u>

Kincaid and Collins began living together in 1974 in Grand Blanc, Michigan.  Kincaid was divorced with on-going child support obligations.  Collins was single and, apparently, had recently graduated from high school.  <u>See</u> <u>Notice of Compliance (d/e 143)</u> attached <u>Deposition of Steven R. Collins on June 15, 2010 (Collins Deposition)</u>, at 7, and <u>Deposition of Paul Kincaid on May 20, 2011 (Kincaid Deposition)</u>, at 20, 29.  At the time, Collins was helping a woman named Edna Smitley maintain and renovate several rental properties and collect rents from tenants.  <u>Collins Deposition</u>, at 45; <u>Kincaid Deposition</u>, at 74.  Collins testified that Smitley gave him a number of pieces of furniture because he helped her keep up her

properties. Smitley also agreed to sell a house to Collins and Kincaid on contract for deed for $25,000. Collins and Kincaid testified that Collins put down $5,000.00 on the purchase price at the time the parties executed the contract. Collins testified that he borrowed the money from his father. Collins Deposition, at 72; Kincaid Deposition, at 30-31.

Collins also purchased several pieces of furniture in June 1974 with the money he received as gifts at his high school graduation. 3rd Party Respondent Steven R. Collins' Response in Opposition to United States' Renewed Motion for Turnover (DOC. # 116) (d/e 119) (Collins Response), Exhibit 105, Affidavit of Steven R. Collins dated November 8, 2010 (2010 Collins Affidavit), ¶¶ 14-15 and Exhibit 102, Furniture Sales Receipt dated June 14, 1974; Third Party Respondent Steven R. Collins' Sur-reply to United States Response (DOC.# 129) (d/e 136) (Collins Sur-reply), Exhibit 148, Affidavit of Lucille Collins, ¶ 9.

Collins states that he maintained both a separate checking account and a joint account with Kincaid while the men lived together in Michigan from 1974 to 1978. Defendant Paul Kincaid's Response to United States Response (Doc. # 129) (d/e 142) (Kincaid Response), Exhibit 186, Affidavit of Steven Collins dated September 9, 2011 (2011 Collins Affidavit), ¶¶ 4, 11.

Collins and Kincaid both worked at Flint Board Tractor when they began living together.  Kincaid worked as a bookkeeper until some time in 1975.  Kincaid Deposition, at 9, 21.  Kincaid became unemployed in 1975, and thereafter in 1975, underwent kidney surgery.  Kincaid Deposition, at 9.  Kincaid needed money and sold his record collection and an antique oak icebox to Collins.  Collins Deposition, at 46.  Kincaid had approximately 4,000 records.  Kincaid Deposition, at 36.  Thereafter, Collins started acquiring records.  Collins stated that he had accumulated some 40,000 records, 45s, 78s, and LPs, by the time that they moved from Michigan to Illinois in 1978.  Collins continued buying old records up until the mid 1990s.  Collins Deposition, at 58; Kincaid Deposition, at 64; 2010 Collins Affidavit, ¶ 8; see Collins Response, Exhibits 74-79, Moving Receipt from Allied Van Lines dated September 13, 1979 (listing over 40 boxes of records moved from Michigan to Illinois).

After Kincaid recovered from kidney surgery in 1975, he went back to school to become a licensed hair dresser.  Kincaid was unemployed all of 1976 while he was in school.  Kincaid finished school and got his license in 1977.  Kincaid Deposition, at 10. Collins also became a licensed hair dresser.  Collins and Kincaid then worked as hairdressers in Michigan beginning in 1977.  Kincaid Deposition, at 27.

In 1978, Collins and Kincaid decided to move to Illinois. Kincaid grew up in Carlinville, Illinois, and so was familiar with the area. The two men initially lived in Carlinville. In October 1978, Collins purchased a building located at 110 West Union Avenue, Litchfield, Illinois. Collins renovated the building, and in January 1979, Collins and Kincaid opened a hair salon called the Hair Clinic at the 110 West Union location. Collins Deposition, at 9-13.

In October 1979, the two men bought a house and out building located at 502 E. Union Avenue, Litchfield, Illinois (Premises). The Premises was at the corner of Union Avenue and Harrison Street. The purchase price was $55,000. Collins testified that he paid the down payment of $10,000. Collins Deposition, at 8. Collins mother states that Collins borrowed money from his father to make down payments on houses in Illinois. Lucille Collins Affidavit ¶ 10. Collins testified that he personally did the work to renovate the house and the out building located on the Premises.

Collins testified that he and Kincaid agreed when they bought the Premises that Collins would have an 80 percent interest in the Premises and Kincaid would have a 20 percent interest because Collins put up the down payment and agreed to do the work to renovate the Premises. The deed did not indicate that Collins and Kincaid held unequal interests in the

Premises, and the two men did not execute any written documents at the time regarding their agreement to hold unequal interests in the Premises. The recorded deed stated that two men held the Premises as joint tenants with rights of survivorship.  <u>Collins Deposition</u>, at 36-38.

In 1987, the men moved the Hair Clinic to the out building located on the Premises.  <u>Collins Deposition</u>, at 15.  The Hair Clinic building faced Harrison Street. The Hair Clinic had a separate address of 410 N. Harrison Street.  Collins sold the 110 West Union location some time later.  <u>Collins Deposition</u>, at 14.

Collins and Kincaid ran the Hair Clinic as a partnership.  They did not have any written partnership documents.  <u>Collins Deposition</u>, at 10; <u>Kincaid Deposition</u>, at 13.  They kept joint bank accounts.  <u>Collins Deposition</u>, at 22-25; <u>Kincaid Deposition</u>, at 15-16.  They deposited the proceeds from the business into the joint accounts and operated the business and the house from those accounts.  <u>Collins Deposition</u>, at 26; <u>Kincaid Deposition</u>, at 40-41, 45, 51.

Collins and Kincaid bought and sold cars over time.  Each car was owned jointly.  At the time of Kincaid's arrest in 2006, they owned a 2005 Chevrolet Venture minivan.  <u>Collins Deposition</u>, at 32-33; <u>Kincaid Deposition</u>, at 68.  Collins sold the minivan in May 2009 for $1,000 less

than the balance owing on the purchase loan secured by the vehicle. Collins Deposition, at 34-35.

Collins also had credit card accounts. Collins took out the credit cards in his own name on his own credit, but arranged for Kincaid to be an additional cardholder on the accounts. Collins Deposition, at 27-30.

Collins and Kincaid also ran a disc jockey business called PK the DJ. They performed disc jockey services at weddings, anniversaries, class reunions, and similar private events. The proceeds from the disc jockey business went into the men's joint bank accounts. Collins Deposition, at 27. They operated this business from the late 1970s to the late 1990s. The last gig was in approximately 1997 or 1998. Collins Deposition, at 18; Kincaid Deposition, at 77-79. Kincaid either gave or sold most of the equipment to an individual named Justin Titsworth. Collins Deposition, at 19; Kincaid Deposition, at 79-80. All that remains are two speakers and two turntables. Collins Deposition, at 19. From 1996 to 2005, Collins worked part time as a real estate agent. Collins Deposition, at 16. Collins' earnings from his real estate work went into their joint bank accounts. Collins Deposition, at 26.

In 1994 or 1995, Kincaid's ex-wife commenced actions in Michigan and Illinois to collect unpaid child support from Kincaid. Kincaid was arrested at one point for failure to pay child support. Kincaid Deposition,

at 57.  The court documents submitted by Kincaid indicate that Kincaid's

ex-wife claimed more than $18,000.00 in unpaid back child support.

Kincaid Response, Exhibit 181, Kincaid v. Kincaid, Montgomery County,

Illinois Circuit Court No. 80-F-8, Excerpts from Order Under Reciprocal Act

entered April 10, 1980, and and schedule of unpaid child support from from

1973 through 1993.  Collins and Kincaid testified that Collins paid lawyers

in Illinois and Michigan to represent Kincaid.  Ultimately, the back child

support claim was settled on April 12, 1996, for a payment of $8,500.00.

Kincaid Response, Exhibit 184, Signature Page of Settlement Order

entered April 12, 1996.  Collins testified that he paid a total of $15,000.00

to lawyers and for the $8,500.00 settlement.  Collins states that he got

some of the money by selling his weight room equipment to Lake

Williamson Christian Center in Carlinville, Illinois, for $7,500.00.  2011

Collins Affidavit ¶ 12.

In exchange for Collins' payment of attorneys and the settlement,

Kincaid executed a quit claim deed on December 30, 1995, conveying all of

his interest in the Premises to Collins.  Collins Deposition, at 36; Collins

Response, Exhibit 1, Quitclaim Deed dated December 30, 1995 (1995

Deed).  Collins stated that the $15,000 reflected Kincaid's 20 percent

interest in the equity in the Premises.  Collins Deposition, at 36.  Collins

and Kincaid also executed a document three days later, on January 2,

1996, entitled, "STATEMENT OF OWNERSHIP DATED JANUARY 2, 1996" (1996 Statement).  Collins Response, Exhibit 17.  The body of the 1996 Statement stated,

> Steven R. Collins owns 100% of the property located at 502 E. Union Ave. & 410 N. Harrison St. In Litchfield, Illinois and all the contents in the buildings.

Id.; see Kincaid Deposition, at 58.  Collins and Kincaid did not record the 1995 Deed, the 1996 Statement, or any other documents related to these transactions.

Collins thereafter leased the out building and its contents to the Hair Clinic for tax purposes.  The rent was not paid, but was treated as an accrued obligation of the Hair Clinic on the partnership tax return.  See Collins Deposition, at 82-85; Kincaid Deposition, at 49-50.   The lease also was not recorded.  The out building contained hair salon equipment, including dryer chairs, shampoo chairs, and styling chairs.  The equipment was purchased in 1984.  Collins Deposition, at 92.  Collins stated that he paid cash for the equipment, but could not recall whether he took the cash from the joint accounts or some other source, although he said that it was unlikely that he took the money from the bank accounts.  Collins Deposition, at 93-95.

On November 10, 1999, Collins and Kincaid executed a document entitled Premises Equity Declaration (1999 Declaration).  This 1999

Declaration stated, in part,

> The following property equity declaration is made by and between Steven R. Collins and Paul E. Kincaid both residing at 502 E. Union Ave. Litchfield, IL.  Signed and dated this November 10, 1999.
> Steven R. Collins has 100 percent of the equity and control of and in:  the property/premises located at 502 E. Union Ave. and 410 N. Harrison St., Litchfield, Illinois, with a property # 11-201-099-00 (quit claim deed attached and dated 12-30-1995; the improvements; all the contens in the buildings and the premises, consisting of, but not limited to:
> . . . .

Collins Response, Exhibit 80.  The 1999 Declaration then listed an inventory of the furniture and other personal property on the Premises. Kincaid states that the men executed this document shortly before Collins paid $12,468.00 to pay off the mortgage on the Premises.  2010 Collins Affidavit ¶ 65; Kincaid Response, at 4.  Collins then also began making additional improvements on the Premises.  2011 Collins Affidavit ¶ 14.  The 1999 Declaration was not recorded.

On September 9, 2006, Kincaid was arrested on the charges for which he was convicted in this case.  On September 14, 2006, Kincaid again executed a deed conveying his interest in the Premises to Collins as part of a transaction in which Collins and Kincaid executed a mortgage on the Premises in favor of Kincaid's criminal defense attorneys to secure payment of a promissory note in the sum of $40,000.00.  Kincaid

<u>Deposition</u>, at 55, 59-60; <u>Collins Response</u>, Exhibits 4 and 6, <u>Quit Claim Deed and Mortgage</u>.  This deed and mortgage were recorded.

Collins then secured financing from American Home Mortgage (Bank) in October 2006 to pay off the defense attorneys' note and mortgage.  The Premises was appraised at $125,000.00 as part of the mortgage loan approval process with the Bank.  <u>Collins Response</u>, Exhibit 23, <u>Letter Dated October 10, 2006, from American Home Mortgage to Steven R. Collins</u>.  Collins borrowed $80,000 from the Bank secured by a new mortgage.  Kincaid's criminal defense attorneys received approximately $40,000.00 of the proceeds from the loan to release their mortgage. <u>Collins Deposition</u>, at 38, 39; <u>Collins Response</u>, Exhibit 5, <u>Loan Closing Statement</u>.[1]

Collins continued to pay Kincaid's expenses until February 2008. Collins states that, in total, he paid obligations of Kincaid totaling $89,944.00:

$15,000.00 to Kincaid's lawyers and for the settlement in 1995-96;

$12,468.00 to pay off the original mortgage on the Premises in 1999;

$40,000.00 to Kincaid's criminal defense attorneys in September 2006;

---

[1]The Closing Statement shows that the loan payoff amount was $37,414.56.  <u>See e.g.</u>, <u>Motion</u> ¶ 14.

$6,000.00 to pay credit card debts in December 2006;

$6,143.00 in payments on the Venture minivan from September 2006

to Kincaid's sentencing in February 2008;

$1,800.00 in insurance payments on the Venture minivan from

September 2006 to February 2008;

$2,142.00 in health insurance premiums for Kincaid from September

2006 to February 2008;

$641.00 in life insurance payments from September 2006 to February

2008; and

$5,750.00 in funds deposited in Kincaid's trust account from

September 2006 to February 2008.

2010 Collins Affidavit ¶ 95; Collins Response, Exhibits 5-13.

Collins and Kincaid had no written agreement in September 2006

regarding the payment of Kincaid's future expenses.  Collins Deposition, at

39.  Kincaid states, however, states that they had an understanding that

Collins would pay Kincaid's ongoing expenses,

[I]t is an "Undisputed Material Fact" that Collins (a) did indeed
pay to Kincaid or on Kincaid's behalf, over $62,400 in relation
to the subject real property from September 2006 to February
2008; and (b) that Kincaid and Collins had reached an
understanding in September 2006 that any monies that Collins
paid to and/or on Kincaid's behalf, and any expenses related to
the loan that Collins secured, which provided Collins the
financial ability to make such payouts to Kincaid or on his
behalf would quit and quiet any claim(s) of interest that Kincaid

may think or may have ever thought he had or did have in the subject real property.

Kincaid Response, at 4 (emphasis in the original).

The Premises contained furniture and other contents at the time of Kincaid's arrest in 2006.  Collins stated that several pieces of furniture were given to him by Edna Smitley when he lived in Michigan.  Collins also purchased several pieces of furniture in 1974 and 1975 in Michigan. Collins also stated that he bought some of the furniture in the 1980s in Illinois. 2010 Collins Affidavit ¶¶ 4-35.

There were two pianos on the Premises at the time of Kincaid's arrest.  Collins testified that he bought one of them in Michigan and moved it to Illinois in 1978.  Collins Deposition, at 57-58; Collins Response, Exhibit 73, Moving Records.   He bought the second in St. Louis.  The second is not functional.  Collins Deposition, at 76-77.  Both are listed in the inventory on the 1999 Declaration.

The Premises also housed some smaller items.  There was a collection of Avon bottles.  Collins testified that a customer named Jean Murphy gave him bottles over several years.  Collins also has 105 Avon bottles that he stated he bought for $15.00 at an antique store in Litchfield in June 2009.    Collins Deposition, at 75-76; 2010 Collins Affidavit, ¶ 22 sub par. 1 and Exhibit 2, Receipt Dated June 26, 2009.  There was also a

collection of hen and chicken glassware.  Collins stated that he bought the hen and chicken glassware in the late 1970s in stores and at an auction. 2010 Collins Affidavit ¶ 22 sub par. 3.

Collins states that their joint bank accounts held a total $3,319.16 on the date that Kincaid was arrested, September 6, 2006.  2010 Collins Affidavit ¶ 55.  The sum of $2,800.00 was paid to attorney Andy Scharf between September 8, 2006, and September 12, 2006.  2010 Collins Affidavit ¶ 56; Collins response, Exhibit 90, Letter from Andrew Scharf to Steven Collins dated September 30, 2010. Scharf prepared the mortgage and quitclaim deed executed September 14, 2006, and was one of the named mortgagees on that mortgage.  Collins Response, Exhibits 4 and 6, Mortgage and Quit Claim Deed.  Scharf, however, did not enter his appearance as Kincaid's counsel in the criminal case.

## ANALYSIS

The Government seeks an order to turnover half the value of the personal property at the Premises, all of the joint bank accounts, and half of the equity in the Premises over an above the $80,000 mortgage to satisfy the restitution judgment entered against Kincaid.  The Court will address the personal property and bank accounts first and then the equity in the Premises.

A.    Personal Property

Personal property located on jointly owned real property is presumed to be owned as tenants in common.  In re Smith's Estate, 90 Ill.App.2d 305, 308, 232 N.E.2d 310, 312 (Ill. App. 4th Dist. 1967).[2]  Such personal property is presumed to be owned equally by co-tenants.  People v. Varel, 351 Ill. 96, 100, 184 N.E. 209, 211 (1932).  This presumption can be overcome by parol evidence that the personal property was not owned equally.  Id.  In this case, the Court finds that Collins and Kincaid have met their burden to overcome the presumption.  Collins can trace a significant portion of the furniture to purchases he made in Michigan with his separate funds or to gifts made to him in Michigan by Edna Smitley, Jean Murphy, and others.  The only significant pieces of furniture that were not brought from Michigan are a television entertainment center, a curio cabinet, some sound equipment, a piece of beveled leaded glass, and a piano that is not functioning.  See 2010 Collins Affidavit ¶¶ 22 sub par. 6, 46.  Collins also bought some of the records in the 1980s and 1990s while living in Illinois.

Beyond the fact that Collins can trace most of the personal property to gifts and purchases with separate funds, the 1996 Statement and the

---

[2]Even if the personal property was purchased with funds held in a joint tenancy bank account, the personal property would still be presumed to be held as tenants in common.  The creation of a joint tenancy in tangible personal property requires "a writing specifically describing the property and specifically referring to the incident of survivorship.  In re Smith's Estate, 232 N.E.2d at 312.

1999 Declaration both demonstrate an agreement between the two parties that Collins owned all the personalty on that Premises. The factual circumstances show that Collins provided a benefit to Kincaid for his interest in any personalty. In 1995, Kincaid needed money. He had been arrested and was being sued for back child support. Collins agreed to help, but only if Kincaid agreed that Collins would own the Premises and all the contents. In 1999, Collins planned to pay off the mortgage and make additional improvements to the Premises. Paying off the mortgage was a clear benefit to Kincaid since he was personally liable on the mortgage debt. Collins wanted to make it clear that he owned the Premises and the contents before he made this investment. Kincaid agreed. This evidence rebuts the presumption of equal ownership, at least with respect to personal property located on the Premises as of December 1999 and identified in the 1999 Declaration.

The personal property not included in the 1999 Declaration is a lawn mower. Collins and Kincaid have not presented evidence to overcome the presumption with respect to this personalty. At the time the lawn mower was acquired, the two men were keeping their money in joint bank accounts. The Government is entitled to half the value of the lawn mower.

B.    Bank Accounts

Illinois law recognizes a presumption that each joint owner of a joint bank account owns the entire balance of a joint account.   In re Tucker, 430 B.R. 499, 502 (Bankr. N.D. Ill. 2010).  Absent evidence to overcome this presumption, a creditor of either owner may look to the entire balance of the joint account to satisfy the debt.  Id. (citing Leaf v. McGowan, 13 Ill.App.2d 58, 141 N.E.2d 67, 71 (Ill. App. 1st Dist. 1957)).  Collins and Kincaid present no evidence to overcome this presumption.  Thus, the Government is entitled to look to the entire balance of the joint bank accounts to satisfy the judgment against Kincaid.

The evidence indicates that there was $3,319.16 in the joint accounts on the day that Kincaid was arrested.  In the next week, $2,800.00 of that money was paid to one of Kincaid's lawyers.  The evidence indicates that Kincaid made these payments attorney Scharf for services rendered.  At a minimum, Scharf prepared the documents for the deed and mortgage to Kincaid's defense counsel.  The Government, therefore, is entitled to the remaining $519.16.

The Government argues that the money should have been held to satisfy its claim.  The Government, however, had no lien of the funds until it served the citation to discover assets in February 2009.  See 735 ILCS 5/2-1402(m).  The Government did not engage in any prejudgment

proceedings to assert a claim on the funds.  See e.g., 28 U.S.C. § 3101-05.

Until the Government had a lien, Kincaid could use the funds to pay one of

his lawyers.  The Government is entitled to $519.26 from the funds in the

joint bank accounts.

C.    The Premises

Creditors, such as the Government, are entitled to rely on the record

in the county recorder's office to pursue real property, such as the

Premises, to satisfy debts.  Corn Belt Bldg. & Loan Ass'n v. Grabe, 295 Ill.

App. 135, 141, 14 N.E.2d 672, 675 (Ill. App. 3$^d$ Dist. 1938).  Section 30 of

the Illinois Conveyance Act states,

> § 30. All deeds, mortgages and other instruments of writing
> which are authorized to be recorded, shall take effect and be in
> force from and after the time of filing the same for record, and
> not before, as to all creditors and subsequent purchasers,
> without notice; and all such deeds and title papers shall be
> adjudged void as to all such creditors and subsequent
> purchasers, without notice, until the same shall be filed for
> record.

765 ILCS 5/30.  Pursuant to § 30, all of the unrecorded documents

executed by Collins and Kincaid, including the 1996 Statement, the 1999

Declaration, and the 1995 Deed, are void as to creditors without notice,

such as the Government, with respect to Premises.  The recorded

documents show that Collins and Kincaid took title as joint tenants with

rights of survivorship.  As joint tenants, Collins and Kincaid had equal

ownership in the Premises.  See e.g., In re Wilson's Estate, 336 Ill. App. 18, 32, 82 N.E.2d 684, 691 (Ill. App. 2$^d$ Dist. 1948).

Collins and Kincaid argue that the original deed only created a presumption that they held the Premises as joint tenants and that they have overcome the presumption, just as they did with respect to the personal property on the Premises.  Parties may overcome the presumption that real property held as joint tenants is owned equally, but as to judgment creditors without notice, such as the Government, the evidence must be on recorded.   Section 30 of the Conveyance Act gives creditors the right to the debtor's interest in real property as recited in instruments that are required to be recorded.  Sturdyvin v. Ward, 336 Ill. 594, 603, 168 N.E. 666, 669 (Ill. 1929).   All deeds and instruments affecting interests in real property are required to be recorded.  765 ILCS 5/28; see e.g., King v. DeKalb County Planning Dept., 394 Ill. App. 3d 699, 705, 917 N.E.2d 36, 42 (Ill. App. 2nd Dist. 1977) (an unrecorded interest in land is not effective as to third parties).  Thus, Collins and Kincaid must present evidence recorded at the county recorder's office to show Kincaid only had a twenty percent interest in the Premises originally and that he transferred that interest to Collins in 1995.  Otherwise, the Government, as a creditor without notice, had a right to treat Kincaid as a joint tenant with an equal ownership interest in the Premises as recited in the original deed.

Kincaid and Collins never recorded anything to indicate a change in Kincaid's interest in the Premises until the September 14, 2006, deed. The 1995 Deed, 1996 Statement, and 1999 Declaration are all void as to the Government's claim with respect to the Premises because they were not recorded.[3] These documents cannot be used to overcome the presumption that Collins and Kincaid held that Premises equally as joint tenants with respect to the Government's claim. In light of § 30 of the Conveyance Act, Kincaid and Collins have failed to overcome the presumption that the Premises was held in joint tenancy. For purposes of the Government's claim as a creditor without notice, Kincaid was an equal owner in the Premises when he transferred his interest to Collins on September 14, 2006.[4]

_____

[3]It may seem unfair or incongruous that the 1996 Statement and 1999 Declaration are relevant to overcome the presumption of equal ownership in tangible personal property, but not the Premises. The difference reflects the strong policy embodied in the Illinois Conveyance Act to require transactions involving real property to be recorded on the public record so that creditors and other third parties may rely on the public record to ascertain interests in real property. See Corn Belt Bldg. & Loan Ass'n v. Grabe, 14 N.E.2d at 675.

[4]The cases on which Collins and Kincaid rely are not persuasive. Some of them involve personal property, not real property. E.g., People v. Varel, 184 N.E. at 211. Several involve disputes between co-owners, typically spouses or ex-spouses, rather than creditors. Sebold v. Sebold, 444 F.2d 864, 872 (D.C. Cir. 1971); Duston v. Duston, 31 Colo.App. 147, 150, 498 P.2d 1174, 1175 (Colo. App. 1972); Jezo v. Jezo, 23 Wis.2d 399, 406, 127 N.W.2d 246, 250 (Wis,), rehearing denied, 23 Wis.2d 399, 129 N.W.2d 195 (Wis. 1964). Section 30 of the Conveyance Act protects creditors' claims. Unrecorded deeds and agreements may be effective between the parties, but are void as to creditors without notice. 765 ILCS 5/30. Finally, the Sturdyvin case involved a party that executed a note and mortgage only as a surety. Studyvin, 168 N.E. at 69. There is no issues of suretyship in this case.

The Government claims that the September 14, 2006, conveyance was a fraudulent transfer under the Federal Debt Collection Procedure Act, 28 U.S.C. § 3304(b). If the Government can establish a fraudulent transfer, the transfer may be avoided to the extent necessary to satisfy the debt to the United States. 28 U.S.C. § 3306.

To establish a fraudulent transfer under § 3304(b), the Government may prove either that: (A) Kincaid transferred his interest in the Premises to Collins on September 14, 2006, with the actual intent to hinder, delay, or defraud creditors; or (B) Kincaid transferred his interest in the Premises without receiving reasonably equivalent value at a time when Kincaid (i) was engaged or about to engage in a transaction or business for which his remaining assets were unreasonably small, or (ii) knew or reasonably should have known that he would incur debts beyond his ability to pay as they became due. 28 U.S.C. §§ 3304(b)(1)(A) & 3304(b)(1)(B).[5] The Court

---

[5]Section 3304(b) provides,

(b) Transfers without regard to date of judgment.--(1) Except as provided in section 3307, a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States, whether such debt arises before or after the transfer is made or the obligation is incurred, if the debtor makes the transfer or incurs the obligation--

(A) with actual intent to hinder, delay, or defraud a creditor; or

(B) without receiving a reasonably equivalent value in exchange for the transfer or obligation if the debtor--

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were

does not address whether Kincaid acted with the actual intent to hinder, defraud, or delay creditors under § 3304(b)(1)(A) because the evidence shows that he made a fraudulent transfer under § 3304(b)(1)(B). Kincaid conveyed his interest in the Premises without receiving reasonably equivalent value when he knew he would incur expenses and obligations that he would not be able to pay.

Kincaid transferred his interest in the Premises without receiving reasonably equivalent value in exchange. To determine the issue of reasonably equivalent value, the Court must consider the factual circumstances and determine the value of the assets the debtor transferred and the value of the assets received in exchange. Barber v. Golden Seed Co., Inc., 129 F.3d 382, 387 (7th Cir. 1997); In re Eckert, 388 B.R. 813, 835 (Bankr. N.D. Ill. 2008). In making this determination, the Court looks to the value of the assets exchanged at the date of the transaction. In re Eckert, 388 B.R. at 835; In re Jumer's Castle Lodge, Inc., 338 B.R. 344, 354 (Bankr. C.D. Ill. 2006). The Court considers the fair market value of the

unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due

28 U.S.C. § 3304(b).

assets exchanged and whether the exchange was an arms length transaction. <u>Barber</u>, 129 F.3d at 387.

As of the September 14, 2006, Kincaid was a joint tenant in the Premises, at least for the purposes of his creditors such as the Government. <u>See</u> 765 ILCS 5/30, discussed above. As one of two joint tenants he had an equal interest in the Premises. The Premises was appraised at $125,000.00; thus, Kincaid had an interest worth $62,500.00. On that date, Kincaid exchanged his interest in the Premises for Collins' promissory note to pay Kincaid's lawyers $40,000.00, secured by a mortgage, and an unwritten understanding that Collins would pay Kincaid's ongoing expenses.

The value of Collins' agreement to pay Kincaid's expenses as of September 14, 2006, was speculative at best. The agreement was not an arms-length transaction. The two men had been living together for more than thirty years, and the arrangement was pressed upon them by Kincaid's arrest. Kincaid and Collins also had no idea how much the total expenses would be; they did not know how long Kincaid would be in custody, and they did not know what his expenses would be while he was in custody.

Collins lists $22,476.00 in expenses that he paid after September 14, 2006, on behalf of Kincaid. Collins includes $6,000.00 in credit card

payments, $6,143.00 in car payments on the Venture minivan, and $1,800.00 in car insurance payments.  2010 Collins Affidavit ¶ 95. Collins paid these expenses on his own behalf.  Collins was personally contractually obligated on these debts regardless of any agreement with Kincaid.  He was the primary card holder on the credit cards and he owned the Venture minivan jointly with Kincaid.  Collins Deposition, at 27-30, 34-35.  Collins continued to drive the van until 2009.  He would have been required to make these payments regardless of his understanding with Kincaid.  He did not make these payments as part of his obligation to Kincaid under their unwritten agreement.

Collins paid the remaining $8,803.00 on behalf of Kincaid from September 2006 until February 2008.  The issue, however, is not what Collins actually paid as part of his agreement to pay Kincaid's ongoing expenses, but what Collins' agreement to pay those expenses was worth on September 14, 2006, the date of the transfer.  On that date, the two men had no idea how long Kincaid would be in custody or how much his expenses would be.  For this reason, the Court finds that the value of this unwritten understanding was nominal on September 14.[6]  Kincaid,

---

[6]Even if the Court valued the unwritten agreement at the full amount paid, $8,803.00, Kincaid would have received only $48,803.00 for his interest worth $62,500.00.  He still would have not received reasonably equivalent value for his interest in the Premises.

therefore, transferred his interest in the Premises worth $62,500.00 for $40,000.00. Kincaid did not receive reasonably equivalent value in exchange for his interest.

Kincaid further knew that he was going to incur debts beyond his ability to pay when he made the transfer. 28 U.S.C. § 3304(b)(1)(B)(ii). Kincaid entered into the unwritten agreement with Collins that Collins would pay those future debts because he anticipated that he would incur obligations that he would not be able to pay. Kincaid thereby moved his equity in the Premises out of his own name, which denied general creditors like the Government from looking to that equity to satisfy their claims, but Kincaid retained a benefit from that equity because Collins would continue to use that equity to provide for Kincaid's ongoing needs. That is the essence of a fraudulent transfer: Kincaid moved assets out of his own name, but retained the benefit of the assets. The Court finds that Kincaid made the fraudulent transfer of the portion of the $62,500.00 equity in the Premises that exceeded the $40,000.00 received on September 14, 2006, or $22,500.00, pursuant to 28 U.S.C. § 3304(b)(1)(B)(ii). The Government is entitled to avoid the fraudulent transfer to the extent of $22,500.00. 28 U.S.C. § 3306(a)(1).

Collins and Kincaid argue that Kincaid received reasonably equivalent value for his interest in the Premises. They argue that Collins

paid the $10,000.00 down payment in 1979, paid $15,000.00 to resolve Kincaid's back child support obligations in 1995 and 1996, and paid $12,468.00 to pay off the original mortgage on the Premises in 1999.   The Court disagrees.  The issue is the benefit Kincaid received at the time of the transaction.  In re Eckert, 388 B.R. at 835; In re Jumer's Castle Lodge, Inc., 338 B.R. at 354.  Kincaid did not receive any of these payments in exchange for the September 14, 2006, deed.  Collins made these payments years earlier, long before Collins and Kincaid contemplated the September 14, 2006, transaction.  These payments are not relevant to determine the value that Kincaid received in exchange for the September 14, 2006, conveyance.

Collins and Kincaid challenge the validity of the $125,000.00 appraisal.  The Court, however, is persuaded that the appraisal is a credible estimate of the value of the Premises on September 24, 2006. The appraisal was performed within a month of the September 14, 2006, conveyance.  The appraisal was performed as part of Collins' application for a mortgage loan with a disinterested lender.  The lender accepted the appraisal as a valid estimate of the Premises's value and closed the loan. The fact that the appraisal was done in connection with an arms length transaction with a disinterested business such as the Bank persuades the Court that the appraisal is a credible estimate of the value of the Premises.

Collins argues that the Court should subtract hypothetical transaction costs that would be incurred in a sale of the Premises from the appraised value to determine the value of Kincaid's interest in the Premises. Collins cites no authority for this proposition, and the Court is not aware of any. The determination of whether a party received reasonably equivalent value is based on market values. Barber, 129 F.3d at 387. Hypothetical transaction costs are not considered.

Collins and Kincaid last argue that Kincaid did not have any intent to hinder, delay, or defraud creditors. They argue that the 1995 Deed, 1996 Statement, and 1999 Declaration prove that Kincaid acted in good faith on September 14, 2006, because he honestly believed he gave up his ownership in the Premises years earlier. This argument is irrelevant because § 3304(b)(1)(B) has no intent requirement. The transfer is voidable because Kincaid did not receive reasonably equivalent value for the September 14, 2006, transfer when knew he would be incurring additional debts in the future that he would not be able to pay. Under these circumstances, the Government is entitled to avoid the transfer regardless of the debtor's intent. 28 U.S.C. § § 3304(b)(1)(B); see e.g., United States v. Sherrill, 626 F.Supp.2d 1267, 1275 (M.D. Ga. 2009); United States v. Teeven, 862 F.Supp. 1200, 1215 n.16 (D. Del. 1992).

WHEREFORE United States' Motion for Turnover Order (d/e 98) and United States' Renewed Motion for Turnover Order (d/e 116) are ALLOWED in part. Third Party Respondent Steven R. Collins is ordered to turnover to the United States by February 29, 2010,

(a) half the value of the lawn mower located on the Premises; and

(b) the sum of $23,519.16, which represents $519.16 remaining in Kincaid's joint bank accounts with Collins, and $22,500.00 of Kincaid's equity in the Premises avoided as a fraudulent transfer pursuant to 28 U.S.C. §§ 3304(b)(1)(B) and 3306(a)(1).

ENTER:    December 19, 2011

_____*s/ Byron G. Cudmore*_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE